CHRYSLER CREDIT CORPORATION *v.* COMMUNITY BANKING COMPANY

| SUPERIOR COURT | NEW HAVEN COUNTY | FILE No. 145617 |
|---|---|---|

Memorandum filed April 21, 1978

*Greenfield, Krick & Jacobs,* for the plaintiff.

*DiSesa, Hogan & Shure,* for the defendant.

BERDON, J. This is an action for replevin brought by the plaintiff Chrysler Credit Corporation against the defendant Community Banking Company. On June 9, 1975, Penta Motors, Inc. (hereinafter referred to as Penta), entered into a security agreement in favor of the defendant, and on the same day the defendant took possession of all of Penta's assets, including automotive parts and accessories (hereinafter referred to as the inventory). The plaintiff claimed a security interest in the inventory prior in right to that of the defend-

ant and made demand for the return of the inventory. Upon the defendant's refusal to return the inventory, the plaintiff brought this action for replevin. Possession of the inventory was turned over to the plaintiff pursuant to a court order and the inventory was sold for the sum of $33,000.

The security interest of the plaintiff was obtained in the following manner: On December 28, 1972, Penta entered into an agreement with the plaintiff which granted the plaintiff a continuing security interest in, among other items, "[a]ll of . . . [Penta's] inventory of automobile parts and accessories. . . ." This security interest in the inventory was granted to secure both a capital loan note made by Penta, which note was payable to the plaintiff in the amount of $20,000, and other liabilities due from Penta to the plaintiff. Liabilities under the security agreement were defined as "all obligations of . . . [Penta] under said [capital loan] Note, all obligations of . . . [Penta under the security agreement], and all other obligations of . . . [Penta] to . . . [plaintiff], its successors and assigns, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due." On December 15, 1972, pursuant to § 42a-9-401 of the General Statutes, the plaintiff caused to be filed with the secretary of the state a financing statement which listed the plaintiff as the creditor and Penta as the debtor and which provided in part for the following notice: "This financing statement covers the following types (or items) of property: . . . (2) . . . inventory of automotive parts and accessories . . . ."

Penta was continually indebted to the plaintiff from December of 1972. In December, 1972, it was indebted on the capital loan note in the amount of $20,000, which was paid in full on May 14, 1975. In

addition, since December, 1972, there was a wholesale account of indebtedness which was secured by a trust receipt arrangement on automobiles. As of June, 1975, the wholesale account of indebtedness due from Penta to the plaintiff was in excess of $400,000. After the automobiles were repossessed and credited to the account, Penta continued to owe between $86,000 and $90,000 to the plaintiff.

The defendant first claims that since the original indebtedness which was secured by the security agreement, that is, the capital loan note in the amount of $20,000, was paid as of the date of the defendant's lien, the plaintiff ceased to have a security interest in the inventory. The defendant's argument in this regard is difficult to follow.

The Uniform Commercial Code clearly provides that the obligations covered by the security agreement may include future advances. "Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." General Statutes § 42a-9-204 (3). In the present case, the security agreement clearly stated that it was to secure not only the capital loan note, but also all other obligations of Penta to the plaintiff.

The defendant next argues that the plaintiff should have filed another financing statement to give notice of the wholesale account of indebtedness. This is clearly not the case. Section 42a-9-402 provides that the "financing statement may be filed before a security agreement is made or a security interest otherwise attaches," which was the present case. There is no requirement that additional financing statements be filed. Furthermore, "[a]t no place in the Code is there any requirement that future advances, obligatory or otherwise, be men-

tioned in the financing statement. It is, in fact, contemplated that financing statements will be filed before there are security interests in many instances." Uniform Commercial Code, Form 9:1055, Authors' Comment on Article 9 Revisions, 5 U.L.A. (Master Ed., 1978 Cum. Pocket Part).

The review committee of the Uniform Commercial Code found it unnecessary to recommend any revisions to § 9-204 to cover such future advances under the original financing statement. "The Review Committee for Article 9 of the Permanent Editorial Board for the Uniform Commercial Code, in its Final Report in 1971 with respect to proposed amendments to the Code, considered the *Coin-o-Matic* [*Coin-o-Matic Service Co.* v. *Rhode Island Hospital Trust Co.,* 3 UCC Rep. 1112 (Superior Ct., R.I.)] line of cases, stating, 'The Committee disapproves this line of cases, and believes that an appropriate financing statement may perfect security interests securing advances made under agreements not contemplated at the time of the filing of the financing statement, even if the filing of the advances then contemplated have been fully paid in the interim. Under the notice-filing procedures of the Code, the filing of a financing statement is effective to perfect security interests as to which the other required elements for perfection exist, whether the security agreement involved is one existing at the date of the filing with an after-acquired property clause or a future advance clause, or whether the applicable security agreement is executed later. . . . The Committee considered drafting a provision emphasizing its disagreement with the *Coin-o-Matic* line of cases, but concluded that the existing Code is clear enough, and should not be disturbed just to overrule some lower court cases.' Final Report at 226–7." *In re Gilchrist Co.,* 403 F. Sup. 197, 202–203 (E.D. Pa.).

Any other construction would defeat the purposes of the Uniform Commercial Code which are to facilitate commercial transactions and to give notice of security interests by filing in order to put subsequent creditors on notice.

"The whole purpose of notice filing would be nullified if a financing statement had to be filed whenever a new transaction took place between a secured party and a debtor. Once a financing statement is on file describing property by type, the entire world is warned, not only that the secured party may already have a security interest in the property of that type . . . , but that it may later acquire a perfected security interest in property of the same type acquired by the debtor in the future. When the debtor does acquire more property of the type referred to in the financing statement already on file, and when a security interest attaches to that property, the perfection is instantaneous and automatic. . . .

"Different fact situations may arise resulting in different arrangements between the secured party and the debtor, all within the contemplation of the code. For instance, in their initial dealings they may contemplate either a number of financing transactions, all secured by the property to which the security interest originally attaches, or they may create a single obligation from the debtor to the secured party, to be secured by property the debtor then owns and additional property that he will later acquire. Furthermore, a transaction between the parties may involve a combination of both of these. Even where the parties originally contemplate a single debt, secured by a single item of property or a single group of items, the secured party and the debtor may enter into further transactions whereby the debtor obtains additional credit and the secured party is granted more security. The validity of

such arrangements as against creditors, trustees in bankruptcy, and other secured parties has been widely recognized by many courts. See, *DuBay* v. *Williams,* 417 F.2d 1277 (9 Cir. 1969); *Grain Merchants of Indiana, Inc.* v. *Union Bank & Sav. Co.,* 408 F.2d 209 (7 Cir.), certiorari denied sub nom. *France* v. *Union Bank & Sav. Co.,* 396 U.S. 827 ... (1969); *Rosenberg* v. *Rudnick,* 262 F. Supp. 635 (D. Mass. 1967). . . .

"The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement describing the collateral filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender has a perfected security interest in the collateral not only for the original debt but also for the later advance. The instant matter involves a parallel situation. See, *In re Rivet,* 299 F. Supp. 374 (E.D. Mich. 1969)." *James Talcott, Inc.* v. *Franklin National Bank of Minneapolis,* 292 Minn. 277, 290–92.

The strict construction of the so-called "dragnet clauses" in security agreements may have its proper place in appropriate equity proceedings; *Wong* v. *Beneficial Savings & Loan Assn.,* 56 Cal. App. 3d 286; but it clearly should not apply to security interests under the Uniform Commercial Code.

Since the plaintiff's financing statement was filed first, it had a superior lien. General Statutes § 42a-9-312 (5) (a). Therefore, the plaintiff was entitled to the immediate possession of the inventory which the defendant wrongfully detained.

Accordingly, judgment is rendered in favor of the plaintiff on the complaint for replevin, together with taxable costs.